Good morning, everyone. Welcome. Our first case for argument this morning is Edward Snukis v. Matthew Taylor. Mr. Miller, good morning. To thank the Court and the judges for the time that it's taken to review the briefs, I would like to begin by, I know the Court knows all the facts, but just briefly to identify the players, the key players. There's Mr. Snukis, who is a gentleman who ends up dying as a result of this incident. There's Officer Taylor, who is a supervising officer, and his trainee, Trevor Koontz. On the morning of the death of Mr. Snukis, September 13, 2019, Officer Taylor, as a supervising training officer, told Officer Koontz that he has to do the following every day. Every shift on every run, Officer Koontz has to state the following, Whoever I'm dealing with may try to kill me. I will not make a mistake so that my wife is a widow. I will not search until after subject is handcuffed and properly secured. Those statements describe exactly how Officer Koontz treated Mr. Snukis when the officers arrived on the scene. There was no communication. There was no discussion. They simply, Officer Koontz approached Mr. Snukis, grabbed his arm and tried to put him, what would appear from the video, into handcuffs. Mr. Snukis was standing outside of a business that he thought he'd parked his truck at. He'd gone inside and asked if his truck was there, and no one could help him. So he leaves the building and he walks out near the road. And the owner, the manager of the business, the collision center, calls 911 and says, Hey, we got this guy. He was wandering around our lobby, thinks his car is here. It's not. But now he's standing outside by the road, and we're afraid he may be inebriated. That's not exactly what he said in the call. I'm not quoting you on that. Yeah, let me quote. We have a gentleman who keeps coming into the back lot. He appears to be impaired, and he's kind of refusing to leave. He's kind of hanging outside. He's looking into the windows of the body shop, and he tried to walk into the main shop. We told him to leave, and he keeps coming back. Yes, sir. That's what the officers knew when they arrived at the scene and confronted your client. That's different than the officers knowing or thinking that he was there because he thought he parked his car in the parking lot, and he was innocently looking for his car. Thank you, Your Honor. I apologize for misstating that. But I think that's important to the extent that it goes to your claim of excessive force and particularly qualified immunity. How do you get around the qualified immunity argument here? What's your best case that says in circumstances like this, the officer should not have approached Mr. Sanoukis with the intention to handcuff him? We've cited the Gupta case and discussed it in our brief and believe that to be the best one for us. Yes, Your Honor. Understanding there's not a lot of case law on this specific set of facts. But back to you. I'm sorry. Well, let me, since you're talking about the facts, let me ask you about the record. What record evidence do we have about Taylor's, Officer Taylor's strikes to Mr. Sanoukis' head? Now, both parties cite Taylor's deposition, the use of force report. Both parties are saying four to six hits. I'm looking at the deposition, the use of force report. That number's not in there. So I have two questions. Where do we find the number? It's not in what either party has cited. And what do we have in the record about the hits? Were they quick in succession? Were they delayed? Is the number of hits disputed? I don't believe it is. I believed that it was in the use of force report submitted by Officer Taylor, as well as the investigative report that was designated in part of the record. I can't quote the court to that particular page or citation, and I do apologize for that. But it is obviously an important question. It has been undisputed in the briefing that it was six strikes to the head with a closed fist. That comes a little bit later. I'd like to go back in the sequence of events. And what about my question about how quickly those strikes happened? Were they boom, boom, boom, or was there a delay between the strikes? Because if you recall, well, I know you recall, we have black video. The video is blacked out for that portion. All we have is audio. Right. Well, there is audio on both cameras, and there's no video on one camera. The other camera is not lit up until the third officer, Hackworth, shows up and shines his light onto the two other officers. So if you look at Officer Hackworth's vehicle cam and his body cam, you will be able to see the last attempts to secure Mr. Snookus. So you're telling me on that video you can see hits? I believe that is correct, yes, Your Honor. And there's also the witness who saw the officer, Christy McGowan, who saw the officer, according to the police report, the investigative report, on top of Mr. Snookus, and I believe attempting to strike him. But to get to your point, there's been no dispute that he struck him. It's been justified as being reasonable because he was grabbing for his groin, he was grabbing for his gun or his taser, even though we believe the evidence shows, as we pointed out in the brief, that that couldn't have happened because of the way that the officers were situated on top of him. So to go back to the beginning, I think, is important in a couple of respects. Your Honor points out that exactly what was said is important to know what the officers knew at the time. The officers weren't aware of all of the information that an unknown, bald, white man had supposedly done in the vicinity earlier in the day. None of that was known to the officers. There's simply no evidence that it was. What was known is that this trainee, Officer Koontz, was having difficulty with his training, his field training. He was assigned to Officer Taylor, and Officer Taylor, from the moment they began the day of this incident, told him to be more aggressive, told him that anyone, not someone who has an arrest warrant, not someone who's been accused of a violent or severe crime, that anyone he may come into contact with will try to kill him. So he was told, through that message and through his other training, that he should be aggressive with everyone and assume that everyone would try to kill him. We believe that set the dominoes, in effect, that that's where this begins and it escalates because of that, not because of anything Mr. Stukas did, or, at the very least, that the facts are disputed about that. So one example of that would be, did Mr. Stukas do a roundhouse punch at Officer Koontz? The Officer Taylor says he did. Officer Koontz says he did. I've looked at the video. There's two different angles, and I don't see, our expert didn't see, Mr. Stukas swinging at either of the officers. It appears that he swings his body away from the officer and they both fall to the ground. Defendants say Stukas was struggling and resisting and struggling the entire time they were attempting to handcuff him. Yes, that's correct. Below in the district court, did you dispute this fact? And if so, what's the citation where? In the briefing or in the record? It would be in the, our dispute is the video footage itself. He does not, well, let me back up. What they don't do when they arrive on the scene, what the officers do not do is say why they're there. No, I'm asking you where below. In the body cam. No, no, no. Where below? You're saying in what briefing did you dispute the fact that he was? In our original brief in response to the motion for summary judgment, Your Honor. And what about in the facts that you submitted to the district court for summary judgment? That's in the same document, yes. And maybe when you come back you can tell me which paragraph. I'll try to find that. Thank you. Okay. I just have a couple more minutes of my initial time. Does anyone have another question? Okay. I'll reserve the remainder of my time. That's fine. Thank you. Mr. Lubberman. Good morning, Your Honors, and may it please the Court. I just wanted to pick up briefly on that last question about any dispute regarding whether Officer Koontz was punched. And I don't have the page in Mr. Miller's briefs handy, Your Honor, but I can say that the district court did address this issue. The only suggestion of a dispute that Mr. Miller offered in those briefs was that the video does not show the punch happening. But as the district court noted, the evidence for the punch happening didn't come from citations to the video. It came from the officer's depositions. And there is no evidence to rebut that in the record that I've been able to locate or that Mr. Miller has referred to. So I don't believe there is a genuine dispute as to whether Officer Koontz was punched in the face by Mr. Snukas. And generally, along those same lines, to address some of the other questions that came up before, this description of there was no communication with Mr. Snukas when officers arrived on scene. Well, that's not true, and that is on video. Officer Koontz said, put your hands over your head, put your hands over your head. And Mr. Snukas seems to indicate that he understands what he's being asked. He said, well, hey, what's going on, why? But he does not comply. And what is shown in the video is when Officer Koontz moves to put Mr. Snukas' arm behind him, he starts turning away and swinging, you know, his arms are now in motion. And there's not a lot of clarity as to where, if at any point, his fist may have connected. But Officer Koontz testified to that point. Is there clarity in the record about the number of hits, number of times Taylor hit Snukas? There is not a—Officer Taylor recalled it, I believe, in his use of force support, somewhere between 3 and 6 in his deposition. I believe he gave a different number. But I don't think the parties dispute that there was, in that range of numbers, we've consistently used 4 and 6 in the briefing. I ask because I don't see, every time the parties cite in the briefs these page numbers, that information is not on any of the page numbers either, party cites. But let me ask you this. Even if it was an excessive force, even if the first couple of strikes were an excessive force, why was it not excessive for Taylor to hit Snukas 4, 5, 6 times? Okay, so I'll begin my answer to that question. I know when Mr. Miller was discussing this, Your Honor's question was about, you know, the timing. We don't have any evidence on the timing as far as whether they were in quick succession or if there was any type of pause in between to assess whether Mr. Snukas was beginning to comply. We just don't have that in the record. There is no, from best we can tell from the deposition testimony and the video, which I understand is dark, visually there's no video evidence on this point by the time this part of the incident is occurring. But there are a number of sounds that Mr. Snukas makes throughout, and we don't know the temporality in the video where exactly the strikes were administered. But Officer Taylor's testimony, again, similarly to Officer Kuntz's testimony, unrebutted, is that he issued those strikes until he was able to obtain compliance. And given the situation in particular, whether it was intending to cause harm by grabbing onto his genitals, a sensitive area, or whether it was attempting to reach for a weapon, he had a very compelling reason to ensure that he was getting the compliance he needed to make the scene safe. And that is, when the video comes back to being visible, Mr. Snukas has seemed to sort of start slipping into unconsciousness. He becomes more pliant, and they're able to handcuff him. And that's when Officer Hackworth arrives on the scene. And as soon as they realize that he's unconscious is when Officer Hackworth calls for AMR, which is Evansville's ambulance service. They check his pulse, check his breathing. Initially, both of those things are still present. They administer sternum rubs to try and jolt him back into consciousness. Let me ask you one more thing on this. When, in your view, if a suspect like Snukas is actively resisting, when, in your view, does the force become a jury question? After six punches, maybe after 30, do we need 50 punches? At what point, even if a suspect is actively resisting? I would say, Your Honor, I think whether the number of punches becomes a jury question is going to depend on whether there's a dispute of fact as to whether those punches were necessary. Here, we don't have that. It would be my submission. Again, we don't know the timing. I think both of us would agree on that. So we have the same facts here, and counsel did not dispute below, as is your position, about the act of resistance. There still would be no question. If the officer had hit Snukas 100 times, there's no dispute, question over about excessive force. I would say, Your Honor, given that the clear testimony is that use of force attempts were not occurring on Mr. Snukas when he was not actively resisting, that is something I wanted to underscore in general. There is no suggestion here in the evidence that Mr. Snukas was harmed while pacified or detained. So I would say if the situation is that there's an actively resisting suspect, until there's a genuine dispute about whether they were rendered secured by however many strikes, then there wouldn't be a jury question to reach it. Probably got a little mixed up in there. But let me try it again. If there's no dispute that the number of strikes issued were used to bring an actively resisting suspect into compliance, which I submit is the case here, then I don't see where that becomes a jury question. If there was some other piece of evidence, video, that suggested that there was a lull in between strikes that the officer could have picked up on, that would be a different question. That could be something a jury could be asked to resolve. I hope that answered Your Honor's question. There was some discussion on qualified immunity I wanted to address as well. The Gupta case has, near as I can tell, no bearing on this one. And as the court knows well, when we look for authority that clearly establishes the rights that the plaintiff is contending are violated, that case should be on all fours to the situation that's presented in this case, and Gupta is simply not. And the generality of a suspect who is not a threat should not be harmed doesn't really apply in this case. This is a case where, as has been discussed already, there was active resistance. There is no factual dispute on that question. An officer's uses of force were only to address that active resistance. There's simply no reason they should have been expected to know that efforts to arrest, detain Mr. Snookus and handcuff him in the initial instance when he refused to comply with their instructions, they had probable cause to stop him. As Judge Kirsch quoted from the dispatch calls, there was ample reason to suspect criminal activity was afoot when officers arrived in front of Mr. Snookus. So that initial handcuffing decision, the taser usages where, at this point, and it is clear in the video at that point, Mr. Snookus and Officer Koontzer actively have fallen to the ground. They're scrapping. Mr. Snookus is attempting to flee. Officer Taylor tried to use his taser. It didn't work so well. He rolled around and pulled the barbs out, and he tried to use his taser again. It didn't work for that reason, and then he flees. And that, whether it's the strikes at the end, the taser in the middle, or the handcuffs at the beginning, or the attempted handcuffs at the beginning, at the very least, there would be qualified immunity on all of those points. But I think the district court did correctly identify that each of these uses would be reasonable under our gram factors, under the comparison to the Dockery v. Blackburn case is the most compelling legal citation throughout this briefing, whether it's below or here before this court. In that case, of course, this court found that where a suspect was actively resisting and attempting to remove taser barbs from their body and was attempting to stand despite being ordered to remain on the ground, which is virtually identical to what happened in the situation with Mr. Snookus, that that was a reasonable use of force. And I understand that there are other uses of force that aren't necessarily contemplated within the scope of the Dockery case. But along those same guiding principles, those uses of force are reasonable as well. Really, I think Appellant's argument throughout this whole thing asks the court to ignore portions of the record that are clearly established in the video. And it reflects in statements like that there was no communication before Officer Kuntz attempted to arrest Mr. Snookus. It reflects in the, well, we didn't see the punch on the video, therefore, there's a dispute. That's not in the record. So when you do look at the record, there can be only one conclusion. These officers reacted to a situation that they were put into by Mr. Snookus' active resistance. And as much as I'm sure they would wish it weren't so, to be put in that situation, that is nevertheless what happened to them. If the video doesn't show the punches, and as you say, it's not apparent whether there was a lull between the punches, would that not be drawing inferences at summary judgment in favor of defendants rather than Mr. Snookus, that the officers did not have a chance between hit 1 and 2 or 2 or 3 or 3 or 4 or 5 or 6 to evaluate whether Mr. Snookus was complying before using more force? Talk to me about which way the inferences are being drawn there. Yes, Your Honor. I would say in the city's initial burden on summary judgment, they put up undisputed evidence that these strikes occurred and that they were necessary to gain compliance over Mr. Snookus, who at that point was still actively resisting on a scuffle on the floor on the ground with the officers. If there were to be an inference that could be drawn in appellant's favor, they would need to show their burden, not just simply say, well, we don't see this, we don't know. They need to make their burden to show evidence as to why there should be an inference drawn in their favor at the very least, if not directly conflicting with the city's position. We don't have that. We were asking for an inference that there be an inference, is what this feels like coming from that argument. If there was to be, and along those lines to the question of whether there should be a jury question on the number of strikes that were delivered to Mr. Snookus, first there would need to be some kind of dispute as to whether that was material in the sense that if there was any way to dispute that the strikes administered were necessary. We don't have any reason to dispute Officer Taylor's testimony that Mr. Snookus did not stop until after he delivered all of the strikes that he delivered. So without something to that effect, there would be no need to parse between the punches. It simply is, there's no material distinction that comes from that, given that Officer Taylor's testimony at that point is completely uncontradicted. So I think I managed to address all the points I came prepared to make. If there are any further questions from the court, then thank you for your time. Thank you. Mr. Miller. Your Honor, I don't have my brief from the district court with me today, and I do apologize for that, so I'm unable to answer your question. There's one point I want to ask that the court consider, and that is that during the encounter on the ground with Mr. Snookus, and if you listen to both of the tapes and watch the deck cam from Officer Hackworth's vehicle, you're going to hear silence. There are periods of time where you don't hear anything, and at some point after those periods of time, you hear loud shouting, stop resisting, stop resisting. If you look at the time stamp at that point and compare it to the outline of the time stamp in our brief, you'll see that that's already at a point that Mr. Snookus is indicating signs of distress, where he's already agonizingly breathing, where he's already saying, I cannot breathe. Those things have already happened when Officer Taylor, we believe it was, said, stop resisting, stop resisting, stop resisting. Secondly, we pointed out in our briefing in this court that the Officer Kuntz's use of force report describes his force exercise against Mr. Snookus in a way that would have made it impossible for Mr. Snookus to have been reaching around and grabbing Officer Taylor at all. Testimony undisputed is that Officer Kuntz was holding his legs, Officer Taylor was at the upper body, Officer Kuntz was holding Mr. Snookus's left arm, and Officer Taylor was attempting to retrieve the right arm from underneath his body. Well, if Officer Kuntz has the left arm and Officer Taylor is trying to get the right arm from underneath his body, which arm is grabbing his crotch, which arm is grabbing his gun, how can it be that what he says is true? That is exactly the type of inference from the actual evidence that a jury should decide whether that testimony is reasonable. Why? The witness that we could have presented evidence from is dead. He can't speak. And I don't say that this court would intend this, but if death results in the elimination of the only witness who could tell the other side of the story, which is this case, then there is a perverse incentive to make sure that the person doesn't survive because then there's no witness. I'm not saying that happens, but I'm saying in the psyche, in the culture, it would be better for the police if the witness does not survive. If the jury gets to decide whether or not it was reasonable force, whether or not there was active resistance, whether or not there was a reason to detain or arrest Mr. Kuntz or Mr. Snookus by Mr. Officer Kuntz at the very beginning, that's a different story. All of those steps are key to this, and we've outlined them in our brief, and I won't repeat them. But all of those steps are key to understanding what happened and when and who is able to testify and who is not. And Mr. Snookus is not. He was silenced. Now, there is evidence in the record. There was not a request for summary judgment on cause of death, but the evidence was submitted. And that evidence shows both the expert report of Mr. Poustons as well as the report of Dr. Wecht, Cyril Wecht, that the officers did, in fact, strike his head and that that did contribute to his death. Excuse me. I'm sorry. We point out that this information about striking Mr. Snookus in the head was not reported by the police officers on site during the autopsy report, and it suggests that that may be evidence of an attempt to cover up in the autopsy determination of the significance of the strikes to the head. That's as far as we can go with it, and it may or may not be something the court wishes to consider. Those are all my remarks. If there are any questions, thank you for your time.  Thanks to all counsel. The case will be taken under advisement.